# JOSHUA J. UNDERHILL *vs.* THE BUCKMAN FRUIT COMPANY.

*Construction of a Contract Providing that One Party Shall Not Aid Bus iness Competitor of the Other—Renunciation in the Course of Performance—Right to Renew Contract for One Year or as Long as a Contingency Does Not Happen.*

A contract between plaintiff, a dealer in fruit, and the defendant company, an importer of bananas, gave to the plaintiff the right to buy a certain quantity of that fruit, at prices named, from each of defendant's steamers arriving during a designated period; and it was stipulated that the contract should remain in force for one year with the privilege of renewal for another year, or as long as the plaintiff " does not advance, loan or aid any one in the importing bananas." The defendant company repudiated the contract in the course of its performance upon the ground that the plaintiff had purchased bananas from other parties. *Held,* that the purchase of the fruit by the plaintiff from other persons was not the making of an advance, loan or aid to any one in the importing of bananas within the meaning of the contract as deducible from the language used and the course of dealing between the parties, and did not justify the defendant in rescinding the contract, and that consequently the plaintiff is entitled to recover for the breach.

In an action on the above-mentioned contract the evidence was legally sufficient to show that the defendant had imported bananas after its renunciation of the agreement.

When a contract provides that one party may have the privilege of renewing it for another year or as long as he does not advance money to a competitor, the contract can be renewed by that party for one additional year only, and is not unlimited in duration so long as no such advance is made.

Appeal from the Court of Common Pleas (HARLAN, C. J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*R. B. Tippett* and *Wm. S. Bansemer*, for the appellant.

Before the year 1895, the appellant had been obtaining bananas from a firm known as A. B. Bulack & Company, under an arrangement whereby the appellant, by advancing that company money to cover the expenses of sending ships and loading them at the West India Islands (*i. e.*, by acting as "banker" and financing each voyage of each ship,) was furnished by Bulack & Co., fruit at prices far below the prices charged by the Buckman Fruit Company and was also given a handsome return for the risk of his money.

Buckman, not wishing to have a person of any financial strength opposing his company by thus furnishing aid to others who might attempt the business of importing bananas, approached Underhill with the proposal that, if he would discontinue the aid which enabled the Bulack Company to import fruit to this market and would not so aid any one else, the Buckman Fruit Company would let him have fruit at prices which would relieve him from the habitual high rates charged by that company. This proposal was accepted by Underhill, as appears by the contract of April 15th, 1895. In this agreement it plainly appears that bananas are to be furnished Underhill at the specified prices in consideration that Underhill shall not "discount loans or advance money in any way for the purpose of conducting or aiding to conduct the business of importing bananas to this market." That agreement is limited by a special stipulation to one year. The arrangement was continued until the final contract of 1897 was entered into.

The main point in the case is brought out by the second prayer of the appellee, which in effect rules, that the appellant first made a breach of the contract by purchasing from competitors of the appellee engaged in the importation or *sale* of bananas in Baltimore City.

In other words, the contract is construed to be unspeakably drastic upon the appellant, by requiring him to purchase exclusively from the appellee at the stipulated prices, notwithstanding the fact that dealers throughout the city might be selling at cheaper prices, and notwithstanding the further cogent fact, that while the contract was operating, the Buckman Company itself sold, from time to time, even to the retail trade at prices lower than those granted the appellant. In getting at the intention of the parties in this contract the Court will place itself in the position which the parties occupied, and will view the attending circumstances as they appeared to the parties at the time the contract was executed. *Bollman* v. *Burt*, 61 Md. 416; *Baker* v. *Safe Deposit Company*, 90 Md. 756; *N. C. R. R. Co.* v. *Herring*, 93 Md. 174.

It appears that after the Bulack Company began to operate with Underhill's money $2,500 to $8,000 per trip, the profits of the Buckman Company were largely reduced and they were not able to set the prices. " He came to me and he says, Mr. Underhill, he says, you caused me to lose $20,000 last year by advancing money to the Bulack Company to bring fruit into this market in competition with me. I replied to him that I didn't—that I was not in business to make him lose money, that I was in business for the same purpose that he was, that is, to make money. He says, I understand that all you care for is fruit at such prices as will enable you to fill your orders and compete with me or any one else ; and he says that if you do not advance this concern money any longer to load their ships with, I will protect you and I will give you an agreement to that effect, and there were several agreements (previous to this final one) which ran from year to year."

It is plain, then, that the whole purpose of the parties was to provide Underhill with fruit at certain moderate prices so he could remain in business alongside of the Buckman Company, and not be in subjection to high prices, and in return for this privilege, Underhill agreed not to do one specific thing, that is, not to embark his capital in aid of the Bulack concern or any one else attempting the importing business in Baltimore.

The word "aid" between these parties meant nothing further than discontinuing loans or advancing money in any way for the purpose of conducting the business of importing bananas to the Baltimore market.   This meaning is seen from the agreement as worded in the contract of 1895.   It can never be gathered from that contract that Underhill was prohibited from making mere purchases from other dealers, and it was in order to continue the same non-participation of Underhill in the importing business that the permanent agreement of 1897, with its continuing renewal privilege, was en tered into.

It is beyond question that Underhill was induced to give up his profitable agreement with Bulack and to enter into relations with the appellee for the purpose of securing for himself some benefit.   It is, of course, beyond reason to suppose that his, Buckman, agreement bound him, hand and foot, to that company and compelled him to supply himself entirely therefrom.   When there was from the outset the possibility that the Buckman Company's market prices would fall below those stipulated between the parties and when it actually developed that the company did sell at such lower prices to other dealers, can it be seriously contended that the appellant, in addition to granting the Buckmans the boon of withholding his capital from the importing business, must permanently make contributions to them in excess of the market price ?   Such a construction, in the language of the Supreme Court of Pennsylvania, makes the contract "too monstrous and absurd to impute to business men."   *Bickford* v. *Cooper*, 41 Pa. St. 142.

If Underhill was to get any benefit at all under the contract, it was that he could always demand from the Buckman Company (to the extent of 400 bunches per steamer), bananas at the uniform prices stipulated, so that upon the market prices becoming higher, he would be able to undersell other jobbers, to make larger profits, etc.   If the construction adopted by the lower Court is to obtain, then the contract, instead of conferring a benefit, placed a blight upon the appellant's business.

The canons of construction are all against this—"A contract will be construed so as to render it reasonable rather than unreasonable." *Clark on Contracts*, 589; *Russell* v. *Allerton*, 108 N. Y. 288, 292; *Royalton* v. *Turnpike Co.*, 14 Vt. 311, 321; *Bickford* v. *Cooper*, 41 Pa. St. 142; *Wilson* v. *Marlow*, 66 Ill. 385; *Hammon on Contracts*, p. 792.

"When an instrument is susceptible of two constructions, one working injustice and the other consistent with the right of the case, that one should be favored which standeth with the right." *Noonan* v. *Bradley*, 9 Wall. 394, 407.

Again, the contract of 1897 is a proposal emanating from Buckman, which was to be accepted by Underhill, and according to another canon of construction, any doubt or ambiguity in regard to the scope of the word "aid" is to be resolved in favor of the appellant. *Nat. Fire Ins. Co.* v. *Crane*, 16 Md. 260; *Anson on Contracts*, 283; *Brantly on Contracts*, 182.

Finally we have in a forcible manner the construction of the agreement placed by the parties themselves by their conduct from 1895 to 1899.

In the 1895 paper, Underhill's privilege of obtaining bananas was called an *option*. By the 1897 paper the Buckman Company proposes to *furnish* not more than four hundred bunches. Underhill shows that during the entire operation of the arrangement, that he bought from whomsoever he chose, and if he did not desire to take any bananas under the contract, he did not do so. Buckman assented to such action and renewed the contract in 1897, and makes no sign of objection until the winter of 1898-1899.

Finally the second prayer is inconsistent with the contract from the wording standing alone. On its face the contract allows Underhill not more than four hundred bunches per cargo. There is absolutely no attempt to restrict the receipts of his business to four hundred bunches or to prevent him from dealing in more than four hundred bunches from the arrival of one ship to the arrival of the next. Therefore, any bunches needed by him in his business in excess of the four

hundred per steamer must of necessity be obtained by him elsewhere. There is no attempt to compel him to buy such excess from Buckman only.

Under any construction of the contract, any sort of aid given to mere *sellers* of bananas would not be a violation on the part of Underhill. Hence, the second prayer which rules that he commits a breach by purchasing from competitors of the defendant engaged in the importation or *sale* of bananas is flagrantly improper—to say nothing of the unreasonable restriction thus placed upon Underhill. "A construction that would operate as a useless restriction upon trade should be avoided if possible as not within the design of a reasonable man." *Powers* v. *Clarke*, 127 N. Y. 425.

The case of *Davis* v. *Barney*, 2 G. & J. 382, 385, 386, 403, which controlled the decision of the lower Court should have no effect upon this case, as the facts do not fit.

The first prayer of the defendant asks the Court to rule that there is no evidence in the case showing the arrival in Baltimore of any steamer of the defendant after the breaking of the contract. That the Buckman Fruit Company as a carrier of fruit and passengers between Baltimore and the West Indies, has been in active operation since March 3rd, 1899, is a notorious fact. A Baltimore City Court could almost ·take judicial notice of the weekly arrivals of its steamers at that port. It was, therefore, a matter of surprise to learn that the appellee would, by offering such a prayer, imply that arrivals of its steamers (the thing upon which this fruit company maintains its being) might not have occurred.

However, outside of the evidence, the prayer is vicious as it declares that a failure to prove arrival of steamers must compel a verdict for the defendant. We submit that the objection as to non-proof as to the arrival of steamers goes only to the measure of damages, and can extend only so far as to require a finding of merely nominal damages. For the breacch of the defendant of March 3rd, 1899—as does any breach— warrants some recovery, and an absence of evidence as to arrivals would only deprive the plaintiff of a basis for comput-

ing his actual damages.   We submit that scattered all through the evidence there is an abundant showing in this case that the appellee's fruit steamers were arriving in Baltimore with the usual regularity.

The third error we assign is that the second prayer limits the renewal privilege under the contract to a period of one year only.   This is effected by the modification interpolated by the Court when about to grant the prayers in order that length of the running of the contract might also be brought for the consideration of this Court.   By its terms the contract is to remain in force for one year, with a renewal privilege for another year *or as long as* the said J. J. Underhill, *does not advance, loan or aid, etc.*   In consideration for this agreement Underhill undertakes not to loan, advance or aid any individual or corporation importing bananas, etc.

We contend that the renewal privilege thus given to Underhill is in furtherance of the arrangement as intended from the beginning—that Underhill, so long as he should refrain from importing bananas or backing a person importing them, should have the option of getting them from Buckman at the reduced prices; that so long as the parties remained factors in the banana business of Baltimore City that this arrangement was to continue between them; to wit, that the Buckman Company's business was not to be interfered with by any enterprise on the part of Underhill; and that the Buckman Company, in return for the relinquishment by Underhill of the Bulack connection—in return for Underhill refraining from going in later with Bulack when Bulack resumed, and in return for Underhill continuing to refrain from aiding Bulack or any one else, gave this continuing renewal privilege.

"Or" in such cases has been held to have the effect of giving the promisee the benefit *at his option* of the alternative following the " or."   Thus a lease for " seven, fourteen or twenty-one years " has been held to give the lessee an option to determine the lease at the end of the seventh, or fourteenth year, or to hold for the full twenty-one years.   *Doe & Webb* v. *Dixon*, 9 East. 15; *Price* v. *Dyer*, 17 Ves. 356; *Powell* v. *Smith*, 41 L. J. Ch. 734.

It can't be said as to the renewal privilege for one year, *or as long as Underhill does not advance*, etc.; that the phrase " or so long as " might put a qualification on the one year to wit, that the privilege might expire before the year upon Underhill advancing, etc., other importers. Because by the familiar rule of construction, the Court will give effect to every portion of a contract and if " or as long as " is taken to have such meaning then the clause by which Underhill (in consideration for the *privilege* given him) binds himself not to loan or advance, has no effect, adds nothing and is inserted for no purpose. If the last clause be given effect, then the " or as long as " can't mean a restriction on the one year, as by virtue of the last clause the privilege, would terminate immediately upon Underhill giving aid. We think that " *or* as long as " should be construed, " *and* as long as " those two words being so frequently interchanged by the Courts to remove ambiguities and to effectuate intention. *Slingluff* v. *Johns*, 87 Md. 280; *Bettman* v. *Harness*, 42 W. Va. 434; *Chemical Nat. Bank* v. *Colwell*, 14 Daly, 365.

*Randolph Barton* and *Randolph Barton, Jr.*, for the appellee.

It seems that in the year 1898 two other importers started up in business in Baltimore, the Buckman Fruit Co. having previously been the only importer, viz.: the West India Trading Co. and the Monumental Trading Co. Some time after these concerns entered the field, it occurred to Underhill that he could use his agreement with the Buckman Co. as a two-edged sword. By its terms he was entitled to 400 bunches from each steamer at agreed rates for the different seasons. While on an average for the entire year, these rates were quite profitable to him, yet at times, and at certain seasons, the rival concerns that had recently started put their prices below those named in the Buckman agreement for the corresponding season. Underhill concluded that it would be an excellent scheme if during the times when these rivals of the Buckman Co. sold their fruit *below* his contract price with Buckman he should buy from them ; while holding Buckman to the con-

tract when the market price and the price asked by its rivals were *above* the Buckman prices. In other words, to use the Buckman agreement on the " heads I win, tails you lose " principle. He does not deny, on the contrary, distinctly admits, that he did this, but justifies his action on the ground that the agreement did not forbid his so doing.

When the defendant company learned of this highly profitable method that Underhill had evolved, it naturally felt that its obligation to him had ceased. Accordingly, Buckman on March 3rd, 1899, wrote the plaintiff a letter in which he states that because of the action of the plaintiff in buying no fruit from the Buckman Co., but on the other hand buying from its opponents, the company considered the agreement at end. Subsequent letters from Underhill failed to change this attitude, whereupon on April 17th, 1899, the plaintiff filed against the defendant the declaration in the Baltimore City Court. On December 11th, 1899, the plaintiff made affidavit of removal to the Court of Common Pleas. The case was continued from term to term and finally went on the *stet* docket, whence in October, 1902, three and one-half years after it was entered, the plaintiff called it up for trial. For the alleged *breach of the contract*, the plaintiff claimed fifty thousand dollars damages in his declaration. When he came to his proof, the statement he filed showed that the actual alleged damage represented by the excess prices he claimed to have paid for bananas from March 3rd, 1899, to August, 1900, when he removed to California, amounted in all to only $2,531.67. And if we limit his alleged losses to the time prior to April 28th, 1899, on which date we shall show that, as the Court decided, the contract would have expired in any event, we find that they are cut down to some $280.

The first and prominent fact appearing in connection with the contract is that it is a *conditional* one. It is not an agreement to sell any definite quantity of bananas, or to sell them at any designated time, except in so far as that may be determined by the *number of steamers* of the defendant that might arrive at Baltimore. Plaintiff himself correctly expresses this

in his declaration.    Defendant assumed no obligation to bring in steamers of any definite number or at any definite times ; or in fact to bring in any steamers at all.    Least of all did defendant agree to bring in any steamers, or any particular number of steamers, between March 3rd, 1899, the date of the alleged breach, and April 28th, 1899, when, as JUDGE HARLAN decides, the contract would have expired in any event.    Its sole obligation was that if it had steamers there, and if plaintiff wanted bananas, he might buy them, at an agreed rate, up to a certain quantity from each steamer.

The *arrival of steamers* being a *condition precedent* to any obligation on defendant's part to sell bananas, such arrival must be *averred* and *proved.*    "Where the obligation of a party to a contract is to do certain things only upon the happening of contingent events, such contingencies are in the nature of conditions precedent, and their occurrence must be averred in a declaration founded on the contract."    4 *Ency. Pleading and Practice*, p. 645; *Hinds v. Henry*, 36 N. J. L. 328; *Wilson* v. *Clarke*, 20 Minn. 368; *Stokes* v. *Baars*, 18 Fla. 656; *Relyea* v. *Drew*, 1 Denio (N. Y.) 561; *Moffat* v. *Laurie*, 15 C. B. 582 (old series); *Cheney* v. *Barber*, 1 Col. 260; *Strauss* v. *Union Tel. Co.*, 164 Mass. 130; *Redman* v. *Ætna Ins. Co.*, 49 Wis. 438; *Hawley Furnace Co.* v. *Hooper*, 90 Md. 390; *Lewis* v. *Tapman*, 90 Md. 309; *Murdock* v. *Caldwell*, 8 Allen (Mass.) 309.

Although the fact that the defendant company soon after March 3rd, 1899, went out of business (its successor being the United Fruit Co.) and the fact that while it was in business the number of steamers it brought in varied greatly, made it a *practical* as well as technical requirement to *prove* how many steamers arrived from which defendant was liable to sell fruit ; yet from the standpoint of the case as presented by the evidence it is immaterial whether *in fact* after March 3rd, 1899, defendant brought in any steamers or not.    Doubtless it did. But there is *no evidence* that it did, and in attempting to hold the defendant on an obligation whose very foundation is the arrival of steamers, the plaintiff makes out absolutely no case

unless he *proves* such arrival.    "If left to enter the domain of inferences we might conclude that the property was the same, but the plaintiff, to recover, must rely on something better than inferences.    *    *    *    It was in his power to prove the fact that he should have done so."    *Cheney* v. *Barber*, 1 Colo. p. 260.

The case is analagous to that of suit on a note promising to pay *when able*.    This note will maintain a suit, but to do so the *ability* of the maker must be *proved*.    *Century Digest*, 11th vol., p. 1132; *Salinas* v. *Wright*, 11 Tex. 572; *Work* v. *Beach*, 59 Hun. (N. Y.) 625; *Martin* v. *Ferguson*, 3 Ky. Law. Rep. 445, and *Myrick* v. *Merrick*, 22 Fla. 335.

It would be absolutely impossible for the jury without any proof as to what steamers came in and *when* they were in, to calculate from the evidence, what part, if any, of the bananas shown on his list he would have had the right to buy from the defendant at other prices.    We do not mean to argue that failure to prove actual damage disentitles the plaintiff to a verdict for at least nominal damages, as we are of course aware of the established rule on this point.    But we use this as an illustration of the unfairness of attempting to hold the defendant liable for something, when there is not an atom of proof either as to the extent of its liability, or even that the conditions had arisen under which alone it could become liable at all.

The contract left the option to the defendant to bring in fruit, and the *exercise* of this option was a *condition precedent* to any obligation from the defendant to the plaintiff.    A mere *repudiation* of the contract did not *per se* establish any liability against the defendant in this case, and that it was absolutely obligatory upon the plaintiff to prove the happening of the contingency, as mere *waiver* or *prevention* of its happening would not make defendant liable.    *Hinds* v. *Henry*, 36 N. J. L. 328; *Wilson* v. *Clarke*, 20 Minn. 367; *Murdoch* v. *Caldwell*, 8 Allen, 309; *Stokes* v. *Baars*, 18 Fla. 656; *Myrick* v. *Merritt*, 22 Fla. 335; *Relyea* v. *Drew*, 1 Denio, 561; *Walker* v. *Tirrell*, 101 Mass. 257; *Redman* v. *Ins. Co.*, 49 Wis. 431; *B. & O. Co.* v. *Brydon*, 65 Md. 198; *Dugan* v. *Anderson*, 36 Md. 567;

*Pinckney* v. *Dumbruan*, 72 Md. 173; *Lewis* v. *Tapman*, 90 Md. 294; *Hawley Furnace Co.* v. *Hooper*, 90 Md. 390.

The contract is dated April 28th, 1897. It was "renewed for another year," or up to April 28th, 1899. It either expired on that date, as defendant contends ; or it continued *ad infinitem*, dependent entirely on the will of the plaintiff, as plaintiff contends.

Defendant claims that the contract might be continued by the plaintiff for two years in all, but that its duration should only be "as long as" the plaintiff kept his side of the agreement ; in other words, that it is equivalent to "provided" the plaintiff, etc. We claim, in short, that this clause was inserted as a possible *limitation* on the contract, and not for the purpose of extending it absolutely indefinitely. We may sum up our reasons briefly as follows :

The contract is a one-sided one ; no matter when it expired, it practically threw all the obligations covered by it on the defendant.

It is drawn on plaintiff's letter head, and apparently by the plaintiff. Accordingly, it should be construed, in case of doubt, more strongly against the plaintiff.

Our construction is in accord with common sense. No one in his sane senses, would tie himself up *for eternity* under such a contract, especially when the other side was *not* bound.

Plaintiff's construction, that the contract shall last *as long* as plaintiff chooses not to aid other importers, no matter how long this may be, renders useless and idle the limitation of the contract to *one year;* if plaintiff's construction is right, there was no occasion to *renew* the contract—it was continuous and unlimited in duration.

It also renders useless, as well as meaningless, the expressly given privilege of renewal for another year. What would be the use of providing that plaintiff might renew it *for one year*, only to be followed up by providing that he might renew it *as long as he pleased.*

If the clause referred to meant what plaintiff contends for, it would be null and void. It would be a contract practically

in perpetuity, and furthermore would be absolutely non-mutual and unilateral.

That defendant had no such absurd idea as to bind itself *forever* to sell bananas *at the prices stated in the contract*, regardless of the changing conditions brought about by time, is demonstrated by the fact that the rates have been changed in this contract from those agreed on in the one of April 15th, 1896. The plaintiff did not produce the agreement of April, 1896, but doubtless this too would show a change in the prices. Certainly it was necessary to provide for changes in the prices of bananas.

But conclusive proof of what was meant by this clause is furnished by the contract of April 15th, 1895. That contract starts out by an agreement to sell bananas *"as long as the said Underhill does not advance, etc."* Yet at the end the contract is expressly *limited to one year.* Could the plaintiff contend that *that* contract was also subject to indefinite extension by the plaintiff?

Does it not conclusively show that the words mean, as we have already shown, "provided that," and are intended as a limitation on the contract?

When the plaintiff proceeded to buy his fruit from these rival importers, he did one of the very things that the contract aimed to prevent, and consequently, by the express terms of the contract, the defendant's obligations to him ended. Certainly, *prima facie*, this view seems a reasonable one. Surely when the parties agreed for the *privilege* to the plaintiff of buying a supply of bananas ample for his needs, at stated rates for the year round, which averaged considerably below the market price and the price at which the defendant sold to other people, the ordinary supposition would be that the parties meant that purchases should be made *exclusively* from the defendant. A contract which the plaintiff could claim the benefit of whenever it acted advantageously for him, but could disregard whenever temporarily it might be to his interest to do so, would be a very one-sided one indeed.

Moreover, when we see that at the time the original agree-

ment was made it was designed to divert the plaintiff's business and support from a rival of the defendant; that immediately thereafter the plaintiff did buy bananas exclusively from the defendant.   That before long the defendant was the only importer in the Baltimore market; that new and similar contracts were made from year to year with these conditions existing; that for five or six years, and until within a short time prior to the alleged breach by the defendant, the defendant continued to be the sole importer of bananas in the city of Baltimore, and that consequently it would have been impossible for the plaintiff to buy fruit from other parties; we find the conclusion almost irresistible that the parties expected and intended that the plaintiff should buy *exclusively* from the defendant.

Suppose Underhill had refrained from literally "advancing" or "loaning," but had contracted to take the entire cargoes imported by rivals of the defendant at fixed prices, such as would enable them to compete heavily with the defendant, would anyone seriously contend that this was not "aiding" such rival importers?   And if "aid" would constitute taking their entire cargoes why would it not apply also to taking parts of their importations?

When the Court considers all these circumstances, takes into account the result that would have followed if plaintiff's contention is correct, that he had the right to buy without limit from rival importers, and not at all from Buckman Co., unless he chose to, the Court will then see that the object which both parties agree was aimed at by the contract would have been entirely nullified and frustrated.   *Davis* v. *Barney*, 2 G. & J. 401, is very similar.

BRISCOE, J., delivered the opinion of the Court.

This is a suit brought by the appellant against the appellee company to recover damages for the alleged breach of a contract.

The appellant is a resident of the State of California, but at the time of the alleged breach was engaged in the oyster and

fruit business in Baltimore City, and his principal business was to sell to the retail trade.   The appellee is a fruit company trading as the Buckman Fruit Company, and was engaged in the business of importing foreign fruit, including bananas to the city of Baltimore, and sold to the trade, known as jobbers.

The contract, which is the basis of this controversy, is dated Baltimore, April 28th, 1897, and is as follows :

"I hereby agree to furnish J. J. Underhill bananas to the extent of four hundred (400) from each steamer during the months of May and June of each year at the following prices, namely, firsts, $1.10 per bunch ; eight hands, .80 per bunch ; seconds, .60 per bunch ; thirds, .40 per bunch.

And the remainder of the year, that is ten months, prices are to be the same as originally agreed upon, namely, firsts, $1.00 per bunch ; eight hands, .75 per bunch ; seconds, .50 per bunch ; thirds, .35 per bunch.   It is further agreed and understood that this agreement is to remain in force one year with privilege of renewal for another year, or as long as the said J. J. Underhill does not advance, loan or aid any one in the importing bananas, also the number of bunches not to exceed four hundred (400) bunches out of each cargo.

And in consideration of the above agreement the said J. J. Underhill agrees not to loan, advance or aid any individual or corporation in the importing of bananas into this market.
Signed                              Buckman Fruit Co.,
                                      per
                        C. C. Buckman, Pres't.

It appears, that according to the terms of the contract it was renewed by agreement of the parties for the period of one year, beginning on April 28th, 1898.   Subsequently, on the 3rd of March, 1899, the defendant company notified the plaintiff by letter and for reasons therein stated, which will hereafter appear, that they considered the contract with him, dated April 28th, 1897, at an end.

The declaration alleged that the defendant has ever since the 3rd of March, 1899, refused to comply with its agreement made with the plaintiff and although he has notified the defendant of his renewal of all of his rights under the agreement for another period of one year, and of his intention to resume all of his rights of renewal under the agreement, the defendant

has denied his right of renewal under the contract, and refuses to be further bound by the same, although the plaintiff has in all respects performed his part of the agreement, and is ready and willing to continue to do so, and by reason of this breach, the plaintiff has suffered great loss and damage.

The defendant pleaded to the declaration never promised as alleged and not indebted as alleged, and the case upon trial resulting in a verdict for the defendant, the plaintiff has appealed.

The questions in the case arise upon a single exception reserved by the plaintiff to the rulings of the Court in the granting of the defendant's prayers, which were offered at the close of the plaintiff's case.

The defendant's prayers as granted withdrew the case from the jury and the question here is, as they were in effect a demurrer to the plaintiff's evidence, were they properly granted by the Court.

We cannot concur with the Court below in the instruction granted in this case, and we think there was error in the rulings of the Court upon both prayers.

The defendant's first prayer ruled as a matter of law that there was no evidence in the case legally sufficient to entitle the plaintiff to recover, and the verdict must be for the defendant, because the plaintiff had failed to prove the arrival or presence of any steamer after the alleged breach of the contract on March 3rd, 1899, up to and including the 28th of April, of the same year.

It will be seen upon an examination of the record that there was evidence tending to show the time and dates of the arrival in Baltimore of the company's steamers. The witness H. W. Underhill testified, the company always had one, sometimes more, and sometimes three a week. The letter of March 3rd, 1899, of the defendant company to the plaintiff; the postal cards and the tickets issued by the company, were all evidence tending to show the arrival of the steamers, and this evidence should have been submitted to the jury. There was no contradictory proof offered on the part of the defendant,

and the evidence was legally sufficient to have been left to the jury. *Jones* v. *Jones*, 45 Md. 154; *Co. Commrs.* v. *Wise*, 75 Md. 43; *State* v. *Kent Co. Commrs.* 83'Md. 383. But apart from this the prayer was manifestly erroneous in directing a verdict for the defendant. The facts of the case, as stated in the record, clearly amounted to a breach of the contract by the defendant, and this constituted a good ground for the action. *Eckenrode* v. *The Chemical Co. of Canton*, 55 Md. 56. There was also error in granting the defendant's second prayer. The prayer is as follows: The defendant asks the Court to instruct the jury by the true construction of the contract made between the parties, and offered in evidence, the defendant was bound to sell bananas to the plaintiff only so long as the plaintiff should not loan, advance or aid anyone in the importation of bananas into the city of Baltimore; that such aid included the purchase by the plaintiff of bananas from competitors of the defendant engaged in the importation or sale of bananas in the city of Baltimore; and inasmuch as the plaintiff admits that during the duration of the contract and prior to the alleged breach thereof on the 3rd of March, 1899, he purchased bananas from such competitors of the defendant, then the defendant was justified thereafter in refusing longer to sell bananas to the plaintiff, and the plaintiff is not entitled to recover.

This prayer as granted proceeded upon the theory and asserted the proposition that according to the construction of the contract between the parties the plaintiff should not only "not loan, nor advance nor aid" the competitors of the defendant in the importation of bananas, but that it also prevented the plaintiff from buying from persons engaged in the sale of bananas in the city of Baltimore. This construction of the contract, as placed by the prayer, would prevent the plaintiff from buying from other persons engaged in the sale of bananas and would necessarily limit his business, during the existence of the contract to the four hundred bunches stipulated in the contract.

We are clearly of the opinion that such a construction can-

not be sustained by either the language of the contract, the intention of the parties at the time of making the agreement, nor the subsequent course of dealings between them.    On the contrary the plain language of the contract is "in consideration of the above agreement, J. J. Underhill agrees not to loan, advance nor aid any individual or corporation in the importing of bananas in this market."

The object of the agreement on the part of the defendant company, was to prevent the plaintiff, as was set out in a previous contract between the parties, dated the 15th of April, 1895, from discounting loans, or advancing money in any way, for the purpose of conducting or aiding to conduct the business of importing bananas and foreign fruits to the Baltimore market. And in consideration therefor the defendant company was to furnish the plaintiff with bananas to the amount and at the prices named in the contract.

The undisputed evidence in the case is to the effect that both parties so understood the agreement, and the defendant assented to its renewal in 1897 with a full knowledge of its meaning.    Indeed any other interpretation, it seems to us, would not only violate its plain terms, but would operate as an unreasonable limitation and restraint upon the plaintiff's business, not contemplated by the parties to the agreement. *Guerand* v. *Dandelet*, 32 Md. 568.

Upon the question of the duration of the contract, we need only say, that according to its terms, it was to remain in force for one year, with privilege of renewal for another, provided the plaintiff did not advance, loan nor aid any one in the importation of bananas.    The appellant contends that "by its terms the contract was to remain in force for one year, with a renewal privilege for another year, or as long as he does not advance, loan nor aid in the importation of fruit, &c."    We cannot assent to this contention.    This construction would make the contract unlimited in its duration, so long as the plaintiff complied with the conditions of the agreement, and would render nugatory the clause which provides that it should remain in force for one year with a privilege of renewal for

another year.   But we are not left without light as to the
meaning of this clause of the contract.   The agreement of
April 15th, 1895, of a similar import and between the same
parties, is expressly limited to one year from its date, and
shows that the words of the clause now under consideration,
were intended as a limitation on the contract.   As stated by
the appellee in its brief "if the clause referred to meant what
the plaintiff contends for, it would be a contract practically in
perpetuity and would be absolutely non-mutual and unilateral."

We find no reason for holding that the duration of the con-
tract, in this case, extended beyond the period fixed by the
parties.   The cases relied upon by the appellant to sustain his
contention are distinguishable from this.

For the errors in the rulings of the Court, upon the prayers,
the judgment must be reversed and a new trial awarded.

*Judgment reversed and new trial
awarded with costs.*

(Decided April 2nd, 1903.)